IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:26-MJ-67 |
| THOMAS WEIR PAUKEN II,<br>a/k/a: "Tom McGregor" | **UNDER SEAL** |
| Defendant. | |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Timothy J Healy, being duly sworn, depose and state:

1.      I make this affidavit in support of an application for a criminal complaint and arrest warrant charging THOMAS WEIR PAUKEN II, a/k/a "Tom McGregor," ("PAUKEN") with acting as an agent of a foreign government without notifying the Attorney General, in violation of 18 U.S.C. § 951(a). Specifically, from at least in or about 2019 up to and including in or about February 2026, in the Eastern District of Virginia and elsewhere, PAUKEN acted within the United States under the direction and control of the Government of the People's Republic of China ("PRC"), without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951(a).

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since March of 2019. Since August of 2019, I have been assigned to the Philadelphia Field Office, State College Resident Agency. Through my experiences as a Special Agent, I have conducted counterintelligence, counterterrorism, cybercrimes, and violent criminal investigations, where I investigate offenses involving individuals acting on behalf of foreign

1

governments without notifying the Attorney General, and investigate offenses involving the illegal data transfer of classified information. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.    The facts and information contained in this affidavit are based upon my training and experience, personal knowledge, review of records, and observations during this investigation, as well as the observations of other agents involved in this investigation. This affidavit contains information necessary to support probable cause, but it is not intended to include every fact and matter observed by me or known to the United States.

### 18 U.S.C. § 951

4.    Title 18, United States Code, Section 951 provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required," shall be punished. With several exceptions not applicable here, Section 951 defines the term "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d).

### Background Concerning the People's Republic of China Intelligence Services

5.    According to FBI reporting from multiple FBI investigations, the FBI has learned that the People's Republic of China Intelligence Services ("PRCIS") encompass both civilian and military components of Chinese intelligence programs. Civilian intelligence collection is handled by the Ministry of State Security ("MSS"). The MSS can be described as an institution similar to the FBI and the Central Intelligence Agency ("CIA"), combined under one intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security.

2

6.      Among other things, the PRCIS and its various components are focused on identifying and influencing the foreign policy of other countries, including the United States, and obtaining sensitive and confidential information from those countries. The PRCIS seeks to obtain information on foreign intelligence operations directed at the PRC; corporate and industrial information that could benefit the PRC; biographical profiles of foreign politicians and intelligence officers; and the political, economic, and security policies of other countries that might affect the PRC.

7.      Additionally, the PRCIS and its various components are tasked with conducting clandestine and overt human source operations, of which the United States is a principal target. Human sources or assets are people who agree to help a foreign intelligence service by providing information to that service in response to taskings from foreign intelligence officers or agents. PRCIS human source operations use PRCIS trained intelligence officers, as well as non-professional collectors called "cut-outs" or "co-optees," to recruit, operate, and obtain information from human sources. Cut-outs or co-optees can operate under a variety of covers, posing as diplomats, journalists, academics, or business people both at home and abroad. These individuals are tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the PRC government can use for economic, political, or military decision-making or advantage.

8.      PRCIS source operations tend to originate inside the PRC, where the PRCIS prefers to meet with its sources or assets. To facilitate continued meetings inside the PRC, the PRCIS will arrange and/or pay for travel and expenses. The PRCIS is known to pay their sources not only in cash, but also through other means, including business considerations or other types of assistance within the PRC.

3

9.      Based on my training and experience, I am aware that PRCIS officers and agents employ various forms of intelligence tradecraft to protect themselves and their operations. Intelligence tradecraft includes the use of encrypted forms of communication as well as meetings with sources and assets in private locations.

**Summary of Facts to Support Probable Cause**

10.      As described in more detail below, since at least 2019, PAUKEN has been working at the direction and control of individuals he knows to be working for the PRC, including an individual he knows to be working for the MSS, whom he calls "Cathy." Cathy provided PAUKEN with taskings for PAUKEN to complete, including while PAUKEN is in the United States. These tasks included PAUKEN meeting with potential human sources for Cathy, providing human sources with communications devices (such as a laptop and cellphone) to be used for communication between the human source and Cathy, providing taskings for the human sources on what information Cathy required, and providing Cathy with reports from the human sources. In return, PAUKEN has received at least $100,000 for his work with Cathy.

11.      PAUKEN admitted during a voluntary interview that his work with Cathy—as well as other individuals whom he admitted also worked for the PRC government—was part of a conspiracy to obtain classified information from the United States government. PAUKEN further admitted that he participated in that conspiracy by acting as a middleman between his PRC handlers, like Cathy, and human sources.

**I.      CBP and FBI's January 2025 Interviews of PAUKEN.**

12.      On or about January 29, 2025, PAUKEN entered the United States, from the PRC, at Washington Dulles International Airport.  Agents from U.S. Customs and Border Protection

4

("CBP") examined PAUKEN's luggage and discovered PAUKEN had two cellphones, a laptop computer, and $3,000 USD.

13.     During an interview with CBP on January 29, 2025, at the airport, as well as two subsequent interviews with the FBI on January 30, and 31, 2025, at a location in Washington, D.C., PAUKEN said the following:

14.     In about 2010, PAUKEN moved to the PRC. While in the PRC, PAUKEN worked as a journalist in Hong Kong and worked for China Radio International. PAUKEN then worked for China Central Television and China Global Television Network. Since March 2024, PAUKEN had been working as an editor for Xinhua News.[1] PAUKEN gives ideas to the Chinese government but was initially vague about the process. All his Chinese associates were obsessed with attaining information on PAUKEN's father who had worked for the Reagan administration.  PAUKEN used the alias Tom McGregor at his father's request because his father (who shares the same first and last name) did not want to appear associated with PAUKEN's activities in the PRC.

15.     In or around 2017 (or the time period of the "Trump-China trade wars" as described by PAUKEN), PAUKEN met a man who worked as Xi Jinping's speech writer. This speechwriter and Xi Jinping—the General Secretary of the Chinese Communist Party—communicate regularly. The speechwriter subsequently introduced PAUKEN to a Chinese woman named "Cathy," who PAUKEN was told consulted for a think tank closely connected to the Chinese government. PAUKEN could not remember the name of the think tank but believed it to be a part of Jiao Tong University or Fudan University. But PAUKEN never met Cathy at any university.

---

[1] In my training and experience, Xinhua News is the official state news agency of the PRC and is a ministry-level institution of the State Council, which is the highest administrative organ of the PRC.

16.    Cathy primarily communicated with PAUKEN through WeChat, Signal, Telegram, or in person. Cathy told PAUKEN she cannot visit the United States and had specifically instructed PAUKEN not to talk about her while he was in the United States. PAUKEN did not know Cathy's Chinese name, but described her as a short, darker complexioned Chinese woman in her mid-30s.

17.    Early on in their relationship, Cathy expressed interest in obtaining classified material from PAUKEN.  At the time, PAUKEN said he did not have access to any classified information, nor did he intend to obtain any classified information.

18.    In 2022 or 2023, Cathy gave PAUKEN a lie detector test (believed to be a reference to a polygraph). PAUKEN did not immediately agree to the test, but after approximately two months Cathy convinced him because the reports were going to Xi Jinping and they had to be careful. During the test, PAUKEN was asked approximately 10 questions that required yes or no answers. PAUKEN was asked if he was spying against the PRC and if he worked for the CIA.

19.    PAUKEN would send his written reports or recorded interviews to Cathy through the Telegram or WeChat applications. After Cathy confirmed that she received the reports, PAUKEN then recalled the messages. Cathy instructed PAUKEN to always recall the messages.

20.    PAUKEN initially described Cathy—and other of his clients—as being state security officers, but in subsequent interviews, preferred to refer to them as a "cast of characters."

21.    Regarding his current purpose of traveling to the United States, PAUKEN was in the United States for a few meetings and planned on returning to the PRC in three days. One person with whom PAUKEN planned to meet was, at the time, doing some consulting work and looking for a job in the incoming Trump administration ("Person 1").[2] PAUKEN met Person 1 at a political event held in Washington D.C. in June 2023. PAUKEN planned on meeting with another

---

[2] Person 1 was not hired for the exact job he wanted in the administration but currently works for a U.S. government agency.

6

individual who worked for a financial newspaper. Finally, PAUKEN planned on meeting with an individual who was the president of an energy-focused nonprofit foundation ("Person 2").

22. Cathy paid PAUKEN on multiple occasions based on the information he was able to provide through interviews with Person 1 regarding the thinking of the presidential administration.

23. Prior to the January 2025 trip, Cathy had instructed PAUKEN to give the Samsung phone to Person 1, with instructions on how to use it. Cathy also instructed PAUKEN to purchase a computer in the United States for Person 1, which PAUKEN planned to do with the $3,000 USD. Cathy also tasked PAUKEN to provide to Person 1 the passwords for Signal and Telegram as well as NetDisk.

24. PAUKEN believed that if Person 1 was hired by the incoming presidential administration, he was 80 percent sure that Person 1 would provide classified information to the PRC, despite PAUKEN having advised Person 1 not to do so. PAUKEN was very concerned that Person 1 would eventually provide classified information to Cathy. According to PAUKEN at the time, Cathy's main goal was obtaining classified information from Person 1. Cathy told PAUKEN once, "Tom, you are going to be the one to convince [Person 1] to provide classified information."

25. PAUKEN made several trips to the United States between 2019 through 2025. Cathy would usually pay for PAUKEN's trips (approximately $7,000 to $8,000 USD per trip). Cathy often wired her payments to PAUKEN's wife's bank accounts. PAUKEN was paid approximately $100,000 USD for his reports, which does not include his payment for trips to the United States. Cathy explained to PAUKEN that all his reports were read by Xi Jinping. Cathy paid for PAUKEN and his family a full expense paid trip to Shanghai.

7

26.    PAUKEN also described his work for two people located in the PRC that he called "Richard" and "William." He met Richard and William during the U.S.-China trade wars in 2017. They told PAUKEN that the reports that PAUKEN wrote for them went to Japan, but PAUKEN believed they worked for the PRC government. Like Cathy, Richard and William requested that PAUKEN undergo a polygraph examination, but PAUKEN refused. Richard and William asked PAUKEN to apply to the U.S. State Department and report on his progress.

27.    PAUKEN previously sold reports to a group of Chinese individuals who were from Wuhan. PAUKEN's Wuhan clients mainly sought information about technology and the U.S. Department of Justice. PAUKEN said the Wuhan clients wanted PAUKEN to find an expert who would help them engage in cyber espionage. PAUKEN believed and stated that his point of contact for the Wuhan clients "works for State Security."

28.    At the end of CBP's initial interview on January 29, 2025, at the FBI's request, CBP returned the phones to PAUKEN and instructed PAUKEN to continue his plans as if nothing had changed.  The FBI had determined that any sudden change in PAUKEN's plans could put PAUKEN at risk from the MSS.

29.    At the end of the January 30, 2025, interview, the FBI told PAUKEN that it was okay to purchase the computer in the United States and provide it to Person 1.  The FBI further instructed PAUKEN to continue about his business with the "cast of characters" in the PRC.  But the FBI admonished PAUKEN not to obtain or transfer (or attempt to do the same) any classified material.

**II.    FBI's February 24, 2025, interview of Person 1.**

30.    On or about February 24, 2025, the FBI conducted a voluntary interview of Person 1. Person 1 confirmed that he met PAUKEN, whom Person 1 knew as Tom McGregor, at

8

a political event in the Summer of 2023. Approximately six months later, PAUKEN asked Person 1 for a writing sample to get Person 1 involved in what Person 1 understood to be geopolitical consulting.

31.    Person 1 explained that between approximately the end of 2023 through January 2025, Person 1 provided PAUKEN reports on various topics proposed by PAUKEN. PAUKEN would submit written questions to Person 1, and Person 1 would provide written responses. Alternatively, PAUKEN would record an interview of Person 1, who would answer PAUKEN's questions.

32.    Person 1 knew from PAUKEN that Cathy was a client of PAUKEN's based in Shanghai. Person 1 said that PAUKEN only alluded to Cathy's government affiliation. In one message, PAUKEN falsely told Person 1 that Cathy was not affiliated with the CCP (i.e., the Chinese Communist Party).

33.    According to Person 1, while PAUKEN asked Person 1 for open-source information, PAUKEN told Person 1 that PAUKEN's clients were frequently asking for more secretive information from Person 1.

34.    Person 1 explained that in January 2025, PAUKEN gave him a laptop and Samsung cellphone, which were for communicating with PAUKEN and Cathy, as well as a flash drive and a half-page of notes on yellow paper. Person 1 provided the FBI with the yellow paper, which contained passwords for Telegram and Signal and instructions for logging into NetDisk.

35.    A review of the Samsung cellphone indicated it had two encrypted messaging applications installed, both of which were connected to a user with usernames "Catherine" and "Cathy."

9

36. After receiving the above items from PAUKEN, Person 1 said he told PAUKEN that he no longer wanted to work with him.

**III. PAUKEN's February 2026 Trip to the United States.**

37. On or about February 21, 2026, PAUKEN returned to the United States, traveling from the PRC to Washington Dulles International Airport with a stop in San Francisco. As described below, the purpose of PAUKEN's trip was to complete Cathy's taskings of pitching Person 1 to work with Cathy again and to provide Person 1 with a SIM card to communicate with PAUKEN and Cathy.

**A. FBI's February 2026 interviews of Person 1.**

38. In February 2026, the FBI conducted several voluntary interviews with Person 1. Person 1 explained that he reconnected with PAUKEN about a month prior through a mutual contact, and Person 1 began working with PAUKEN as a potential intermediary on an oil deal involving one or more Chinese or foreign companies.

39. Person 1 explained that he met PAUKEN, along with members of PAUKEN's family and others, at a restaurant in Washington, D.C. on or about February 23, 2026. When PAUKEN and Person 1 had a moment of privacy, PAUKEN told Person 1 that he wanted to talk to Person 1 about working for Cathy again. PAUKEN requested a private meeting and stated he was paranoid about people listening in public places. PAUKEN told Person 1 there would be a bonus that Person 1 might be able to pick up from a P.O. Box in another state.

40. Person 1 explained that also on or about February 23, 2026, PAUKEN gave Person 1 a bag with several gifts, including a passport holder in a box in a brown paper bag. PAUKEN told Person 1 that there was a SIM card inside, but Person 1 assumed it would be inside

the box and threw out the brown paper bag. When Person 1 later inquired about the location of the SIM card, PAUKEN told him it had been in the brown paper bag.

### B.  PAUKEN's February 25, 2026, meeting with Person 1.

41.    On or about February 25, 2026, PAUKEN met with Person 1 at a hotel in Washington, D.C. The FBI simultaneously monitored that meeting and interviewed Person 1 afterward.

42.    In the meeting, PAUKEN gave Person 1 a SIM card.  PAUKEN asked Person 1 if he wanted to resume working for Cathy. PAUKEN offered Person 1 a $10,000 bonus for agreeing to work with Cathy again, which Person 1 could obtain by ostensibly creating a non-profit or a website and accepting the money as a donation via that website. Person 1 was told that this was how Cathy paid Person 2.

43.    PAUKEN told Person 1 that Cathy expected one report per week on similar topics as Person 1 had provided before. PAUKEN told Person 1 that his reports would influence policy and be read by Xi Jinping.

44.    PAUKEN also said that he had been worried that—after PAUKEN's last trip to the United States when he was interviewed by the FBI—Person 1 was setting him up for a "sting operation" when PAUKEN decided to come to the United States to meet with Person 1.

### C.  FBI's February 26, 2026, interview of PAUKEN.

45.    On or about February 26, 2026, the FBI conducted a voluntary interview of PAUKEN in Washington, D.C. The interview was recorded.

46.    In the interview, PAUKEN said that he first met Cathy in about 2019. PAUKEN said that he was still in communication with Cathy and had last communicated with Cathy two days before the trip. PAUKEN confirmed that Cathy paid PAUKEN in cash for the trip.

11

47.    PAUKEN explained that Cathy told PAUKEN to provide a SIM card to Person 1. PAUKEN explained that Person 1 lost the SIM card, and PAUKEN had to purchase another SIM card for Person 1. PAUKEN explained that the SIM card was for Person 1 to set up a Telegram account to speak with Cathy.

48.    PAUKEN said that Cathy never told him explicitly that she worked for MSS, but PAUKEN said that, after the polygraph, it was "obvious" that Cathy was with MSS. Throughout the interview, PAUKEN said he knew Cathy worked for the MSS.

49.    PAUKEN stated that he did not ask anyone for classified information. Instead, he asked people for publicly available information. PAUKEN admitted, however, that Cathy—and other of his clients—asked PAUKEN to obtain classified or non-public information.

50.    PAUKEN stated that he did not want to personally deal with classified information. But PAUKEN admitted that he was part of an agreement with the MSS in which he acted as an intermediary to recruit individuals to provide classified information to the MSS. PAUKEN agreed that his role in this arrangement occurred both before and after the FBI interviewed him in January 2025.

51.    PAUKEN agreed that for both his January 2025 and February 2026 trips to the United States, Cathy provided taskings for PAUKEN to complete in the United States. PAUKEN agreed that he completed those tasks for Cathy.

52.    PAUKEN admitted that Cathy instructed him to delete certain communications, which he said he did.

53.    PAUKEN stated that Cathy instructed PAUKEN to upload a picture of the sky to a messaging platform once PAUKEN landed in the United States. PAUKEN explained that this would show Cathy that PAUKEN made it through CBP unscathed.

54.     At the end of the interview, PAUKEN admitted that, after the January 2025 interviews with the FBI (where the FBI warned him not to talk about their meetings), PAUKEN told Cathy that he had met and spoke with government officials on multiple times when he was in the United States.  PAUKEN said it was "possible" he "may have" told Cathy that he met with the government officials in his hotel room.

**IV.     FBI's Review of PAUKEN's Devices and Communications.**

55.     On February 26, 2026, the FBI executed a search warrant to search and seize, among other items, devices belonging to PAUKEN.  Based on a preliminary review of PAUKEN's devices, the FBI viewed communications between PAUKEN and Cathy on various encrypted platforms. In these communications, PAUKEN and Cathy coordinated in-person meetings in the PRC. The communications also included several examples where Cathy sent PAUKEN a tasking, such as a request for information on a specific topic, and then PAUKEN would send a report back to Cathy. These taskings related to various people, including Person 1 and Person 2.

56.     One exchange between PAUKEN and Cathy began in approximately 2023.  In a 2025 exchange, Cathy sent a series of messages which stated she saw on LinkedIn that Person 1 had been hired by a U.S. government agency, and she wished to discuss with PAUKEN what to do next.

57.     On or about January 9, 2026, Cathy sent a message which read, "Tom do you think this might be a good idea if you let [gendered pronoun] know we have a bunch of money left to [gendered pronoun] as bonus for 2025 and see how [gendered pronoun] reacts?" Based on context, I believe this statement is in reference to the aforementioned bonus for Person 1.

58.     On or about February 20, 2026, PAUKEN communicated with Cathy about his upcoming meetings with Person 1, who was referred to by Person 1's initials. PAUKEN confirmed

with Cathy that he planned on having several meetings with Person 1. Cathy reminded PAUKEN to please "be careful and don't forget about the moments." The FBI believes this to be a reference to the aforementioned reference to the use of the messaging platform to inform Cathy of PAUKEN's status upon arrival in the United States.

## V.    Department of Justice Database Checks.

59.    According to Department of Justice database checks in February 2026, neither Thomas Weir Pauken II, Tom McGregor, nor Thomas McGregor has ever registered under FARA or notified the U.S. Attorney General under 18 U.S.C. § 951 as an agent of the PRC.[3]

//

//

//

//

//

//

//

//

//

//

//

//

---

[3] Pursuant to 28 C.F.R. § 73.3(b) and (c), foreign agents engaged in certain law enforcement or judicial activities may make their Section 951 notifications to Interpol, an FBI Legal Attaché, or the Department of Justice's Office of International Affairs. Based on this investigation, PAUKEN does not fall into the categories of foreign agents who would make such notifications to these entities.

**CONCLUSION**

60.     Based on the foregoing, I submit that there is probable cause to believe that from at least in or about 2019 up to and including in or about February 2026, in the Eastern District of Virginia and elsewhere, PAUKEN acted within the United States under the direction and control of the Government of the People's Republic of China, without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951(a).

Respectfully submitted,

*Timothy J. Healy*

Timothy J. Healy
Special Agent
Federal Bureau of Investigation

Respectfully submitted and attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on February 27, 2026.

Lindsey R Vaala
Digitally signed by Lindsey R Vaala
Date: 2026.02.27 19:19:58 -05'00'

The Honorable Lindsey R. Vaala
United States Magistrate Judge

Alexandria, Virginia

15