

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.

THOMAS WEIR PAUKEN II,
a/k/a: "Tom McGregor"

Defendant.

Case No. 1:26-CR-103 (LMB)

## STATEMENT OF FACTS

The United States and the defendant, THOMAS WEIR PAUKEN II (hereinafter, "the defendant" or "PAUKEN"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.     From at least in or about 2019 up to and including in or about February 2026, in the Eastern District of Virginia and elsewhere, PAUKEN acted within the United States as an agent of the Government of the People's Republic of China ("PRC"), without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951(a).

2.     Since at least 2019, PAUKEN has been working at the direction and control of individuals he knows to be working for the PRC intelligence services, including an individual whom he calls "Cathy." Cathy provided PAUKEN with taskings for PAUKEN to complete, including while PAUKEN was in the United States. These taskings included PAUKEN meeting with potential human sources for Cathy, providing human sources with communications devices (such as a laptop and cellphone) to be used for communication between the human source and Cathy, providing taskings for the human sources on what information Cathy required, and providing Cathy with reports from the human sources.

1

## I.  The People's Republic of China Intelligence Services.

3.  The People's Republic of China Intelligence Services ("PRCIS") encompass both civilian and military components of Chinese intelligence programs. The Ministry of State Security ("MSS"), is one of the PRC agencies responsible for counterintelligence, foreign intelligence, and political security.

4.  Among other things, the PRCIS and its various components focus on identifying and influencing the foreign policy of other countries, including the United States, and obtaining sensitive and confidential information from those countries, such as foreign intelligence operations directed at the PRC, corporate and industrial information that could benefit the PRC, biographical profiles of foreign politicians and intelligence officers, and the political, economic, and security policies of other countries that might affect the PRC.

5.  PRCIS human source operations use PRCIS trained intelligence officers, as well as non-professional collectors called "cut-outs" or "co-optees," to recruit, operate, and obtain information from human sources. Cut-outs or co-optees can operate under a variety of covers, posing as diplomats, journalists, academics, or businesspeople both at home and abroad. These individuals are tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the PRC government can use for economic, political, or military decision-making or advantage.

## II.  PAUKEN's Work as an Agent of the PRC.

6.  In or around 2017, PAUKEN met a Chinese woman whom he knew as "Cathy." Although Cathy had originally held herself out as a consultant for a think tank, based on PAUKEN's interactions with Cathy, including the conduct described in Paragraphs 7 through 9,

2

PAUKEN knew that Cathy was an agent of the PRC intelligence services and by at least 2025 had concluded that she was working for MSS.

7.     Cathy primarily communicated with PAUKEN through WeChat, Signal, Telegram, or in person. Cathy told PAUKEN she could not visit the United States and had specifically instructed PAUKEN not to talk about her while he was in the United States.

8.     Early on in their relationship, Cathy expressed interest in obtaining classified material from PAUKEN.   PAUKEN said he did not have access to any classified information, nor did he intend to obtain any classified information.

9.     In 2022 or 2023, Cathy gave PAUKEN a polygraph test.   PAUKEN did not immediately agree to the test, but after approximately two months Cathy convinced him because the reports were going to Xi Jinping, and they had to be careful.   During the polygraph test, PAUKEN was asked approximately 10 questions that required yes or no answers.   PAUKEN was asked if he was spying against the PRC and if he worked for the CIA.   Mr. Pauken answered both questions in the negative.

10.     Cathy would task PAUKEN with collecting information on specific topics, either from PAUKEN himself or from PAUKEN's contacts.   PAUKEN would compile a written report or a recorded interview based on his or his contacts' answers to Cathy's questions.   After Cathy confirmed that she received the reports, PAUKEN then recalled – thereby functionally deleting – the messages.   Cathy instructed PAUKEN to always recall the messages.   Cathy would pay PAUKEN, and PAUKEN's contacts, for the reports that PAUKEN provided.

11.     For example, PAUKEN met Person 1 in or about the summer of 2023.   Between the end of 2023 and the end of 2024, PAUKEN obtained written responses and interviews from Person 1 about topics that Cathy provided to PAUKEN.   The reports were about political topics,

3

such as campaigns, candidates' policy proposals, and relations between the United States and PRC. Person 1 was located in the Eastern District of Virginia during at least one phone interview with PAUKEN, while PAUKEN was still in the PRC. PAUKEN then worked with Cathy to secure payment for both PAUKEN and Person 1.

12.     While PAUKEN asked Person 1 for open-source information, PAUKEN told Person 1 that PAUKEN's clients were frequently asking for more secretive information from Person 1.

13.     According to PAUKEN, at or around the end of 2024 and into 2025, Cathy's main goal was obtaining classified information from Person 1. PAUKEN believed that if Person 1 had access to classified information, PAUKEN was confident that Person 1 would provide classified information to the PRC, despite PAUKEN having advised Person 1 not to share classified information. Cathy told PAUKEN once, "Tom, you are going to be the one to convince [Person 1] to provide classified information." PAUKEN was very concerned that Person 1 would eventually provide classified information to Cathy and did not agree to "attempt to convince" Person 1 to provide classified information.   In any event, PAUKEN continued to develop Person 1 as a source for Cathy.

## III.    PAUKEN's Trips to the United States.

14.     Cathy tasked PAUKEN with meeting with individuals in the United States who could provide PAUKEN, and ultimately Cathy and the MSS, with information.  Per Cathy's taskings, PAUKEN made several trips to the United States between 2019 through 2025. Cathy would usually pay for PAUKEN's trips (approximately $7,000 to $8,000 USD per trip).

15.     On or about August 1, 2024, PAUKEN entered the United States from the PRC at San Francisco International Airport.  During this trip, PAUKEN took a connecting flight to

Washington Dulles International Airport, located in the Eastern District of Virginia, for the purpose of meeting with Person 1 and other individuals who could provide information to Cathy. PAUKEN's meetings took place within the greater Washington, D.C. metro area.

16.    On or about January 29, 2025, PAUKEN entered the United States, from the PRC, at Washington Dulles International Airport.  Agents from U.S. Customs and Border Protection ("CBP") examined PAUKEN's luggage and discovered PAUKEN had two cellphones, a laptop computer, and $3,000 USD.

17.    Prior to his January 2025 trip, Cathy tasked PAUKEN with providing a cellphone and laptop to Person 1 while PAUKEN was in the United States.  One of the cellphones in PAUKEN's luggage was meant for Person 1, and the currency was meant for PAUKEN to purchase a laptop for Person 1.  The cellphone and laptop were meant for Person 1 to communicate directly with Cathy.

18.    In addition, Cathy tasked PAUKEN with providing Person 1 login information to encrypted messaging platforms.  PAUKEN carried that login information on a yellow piece of paper that was in his luggage when he traveled into the Eastern District of Virginia.

19.    When PAUKEN landed in the Eastern District of Virginia on or about January 29, 2025, he was working at the direction and control of Cathy, whom he knew was an MSS intelligence officer, to provide Person 1 with the cellphone, laptop, and log instructions.  At Cathy's direction, PAUKEN also planned to meet with other individuals, apart from Person 1, during his trip to the United States.

20.    On January 29, 2025, at the FBI's request, CBP returned the phones to PAUKEN and instructed PAUKEN to continue his plans as if nothing had changed.  The FBI had determined that any sudden change in PAUKEN's plans could put PAUKEN at risk from the MSS.

21.    At the end of a subsequent interview with the FBI on January 30, 2025, the FBI told PAUKEN that it was okay to purchase the computer in the United States and provide it to Person 1. The FBI further instructed PAUKEN to continue his interactions with PAUKEN's various contacts in the PRCIS. But the FBI admonished PAUKEN not to obtain or transfer (or attempt to do the same) any classified material. PAUKEN also signed a non-disclosure agreement, prohibiting him from discussing what he spoke about with the FBI.

22.    On or about February 21, 2026, PAUKEN returned to the United States, traveling from the PRC to Washington Dulles International Airport with a stop in San Francisco. The purpose of PAUKEN's trip was to pitch, at Cathy's direction, Person 1 to work with Cathy again.

23.    Prior to the trip, PAUKEN attempted to send, via Person 1, a letter to the U.S. government about his interest in cooperating with the U.S. government.

24.    On or about February 25, 2026, PAUKEN met with Person 1 and told Person 1 that Cathy would pay Person 1 a $10,000 bonus for agreeing to work with Cathy again. PAUKEN told person 1 that PAUKEN was worried that—after PAUKEN's last trip to the United States when he was interviewed by the FBI—Person 1 was setting him up for a "sting operation."

25.    Since working for Cathy and other intelligence officers in the PRC and elsewhere, PAUKEN told the FBI, Person 1, and others that he was not requesting, and he did not want to personally deal with, classified information. But, during a voluntary interview in February 2026, PAUKEN admitted that he was part of an agreement with the MSS in which the MSS used PAUKEN as an intermediary to recruit individuals to provide classified information to the Chinese. PAUKEN agreed that his role in this arrangement occurred both before and after the FBI interviewed him in January 2025.

26.    After the January 2025 interviews with the FBI (where the FBI warned him not to talk about their meetings), PAUKEN told Cathy that he had met and spoke with government officials on multiple times when he was in the United States.  PAUKEN said it was "possible" he "may have" told Cathy that he met with government officials in his hotel room.

27.    In return for working as an agent for the PRC, PAUKEN has received at least $100,000 USD.  In addition to financial compensation, PAUKEN hoped that his work with Cathy would deter the PRC and United States from resorting to military confrontation.  PAUKEN also hoped to use his connections in the PRC and the United States to advocate for religious freedom in the PRC.

**IV.    PAUKEN's Work for Other Intelligence Officers.**

28.    PAUKEN worked for two people located in the PRC that he called "Richard" and "William." He met Richard and William during the U.S.-PRC trade wars in 2017. They told PAUKEN that the reports that PAUKEN wrote for them went to Japan, but PAUKEN believed they worked for the PRC government. Like Cathy, Richard and William requested that PAUKEN undergo a polygraph examination, but PAUKEN refused. Richard and William asked PAUKEN to apply to the U.S. State Department and to report on his progress.

29.    PAUKEN also sold reports to a group of Chinese individuals who were from Wuhan. PAUKEN's Wuhan clients mainly sought information about technology and the U.S. Department of Justice.  The Wuhan clients wanted PAUKEN to find an expert who would help them engage in cyber espionage.  PAUKEN believed and stated that his point of contact for the Wuhan clients "works for State Security." Pauken ceased working with these individuals after they began asking him to engage in espionage activities.

**V.    PAUKEN Never Registered as an Agent of the PRC.**

7

30.     According to Department of Justice database checks in February 2026, PAUKEN never registered under FARA or notified the U.S. Attorney General under 18 U.S.C. § 951 as an agent of the PRC.

\*   \*   \*   \*   \*

31.     This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.  It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

32.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Todd W. Blanche
Acting Attorney General

Date: _June 4, 2026_

By: _____
Gavin R. Tisdale
Assistant United States Attorney

John A. Eisenberg
Assistant Attorney General for National Security

By: _____
Eli Ross
Trial Attorney, Counterintelligence & Export Control
Section
National Security Division

8

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, THOMAS WEIR PAUKEN II, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

THOMAS WEIR PAUKEN II

I am Charles Burnham, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Charles Burnham, Esq.
Attorney for THOMAS WEIR PAUKEN II

9