IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>THOMAS WEIR PAUKEN II,<br>a/k/a: "Tom McGregor"<br><br>Defendant. | Case No. 1:26-CR-103 (LMB) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing. Thomas Weir Pauken II (hereinafter "Pauken") pleaded guilty to acting as an agent of the People's Republic of China ("PRC") without prior notification to the Attorney General, in violation of 18 U.S.C. § 951. For the reasons stated herein, including the parties' agreed upon guidelines calculation reflected in the Plea Agreement (Plea Agreement at ¶ 4), the Government requests that the Court sentence Pauken to 33 months' imprisonment, followed by 36 months' supervised release, and a $100 special assessment.

For at least seven years prior to his arrest, Pauken worked at the direction and control of the People's Republic of China Intelligence Services ("PRCIS") to recruit potential human sources in the United States, tasking these sources to gather sensitive information that would be useful to the Chinese government. As part of this clandestine work, Pauken supplied his sources with communication devices provided by the PRCIS to facilitate the flow of relevant information and compiled detailed reports at the behest of the PRCIS. At bottom, Pauken served as a clandestine intermediary between the PRCIS and individuals in the U.S. in furtherance of the PRCIS's attempts to collect U.S. government information. In return for his efforts to solicit, procure, and

deliver information to the PRCIS, Pauken received at least $100,000, and other benefits such as travel expenses, from PRCIS intelligence officers. Accordingly, the Court's sentence should reflect the seriousness of Pauken's activities and deter others from engaging in similar conduct on behalf of America's foreign adversaries.

## I. FACTUAL BACKGROUND

### A. The People's Republic of China Intelligence Services

The PRCIS has a long history of aggressively targeting U.S. government employees, U.S. servicemembers, and other individuals who have access to sensitive and confidential information.[1] This information often includes detailed foreign intelligence operations, corporate and industrial information, biographical profiles of foreign politicians and intelligence officers, and other foreign, political, economic, and security policies. Among other things, the PRCIS focuses on identifying and influencing the foreign policy of other countries. In furtherance of these efforts, historically, the PRC has recruited U.S. citizens to obtain information, promote PRC interests abroad, and undermine political and democratic institutions within the United States.[2]

#### *i. The People's Republic of China Ministry of State Security*

The PRC Ministry of State Security ("MSS") is the principal civilian intelligence agency housed within the PRCIS. As such, the MSS is largely responsible for performing

1 *See* U.S. Department of Justice, "Department of State Employee Sentenced for Transmitting National Defense Information to Suspected Chinese Government Agents," Sept. 4, 2025, *available at* https://www.justice.gov/opa/pr/department-state-employee-sentenced-transmitting-national-defense-information-suspected.

2 *See* U.S. Department of Justice, "Political Operative Sentenced to 48 Months in Federal Prison for Acting as Covert Agent of People's Republic of China," Feb. 10, 2026, *available at* https://www.justice.gov/opa/pr/political-operative-sentenced-48-months-federal-prison-acting-covert-agent-peoples-republic; U.S. Department of Justice, "Man Pleads Guilty to Conspiring to Act as Illegal Agent of the Chinese Government in the United States," Sept. 16, 2025, *available at* https://www.justice.gov/opa/pr/man-pleads-guilty-conspiring-act-illegal-agent-chinese-government-united-states.

counterintelligence, foreign intelligence, and political security functions. PSR at ¶ 18. Furthermore, the MSS is tasked with collecting information from human sources, of which the U.S. is a principal target.[3] A human source or asset is an individual who agrees to help a foreign intelligence service by providing information in response to taskings from foreign intelligence officers or agents. These human sources are often recruited based on their access to sensitive information, or their peripheral access to government information.[4]

***ii. PRC Intelligence Services Recruitment Tactics***

Although the PRCIS uses trained intelligence officers to cultivate assets, it also employs non-professional collectors ("cut-outs" or "co-optees"), like Pauken, to recruit, operate, and obtain information from a wide variety of human sources. *Id*. at ¶ 20. These cut-outs appear inconspicuous at the outset, generally posing as diplomats, academics, businesspeople or journalists located in both the PRC and abroad. *Id.* However, intermediaries for the MSS are often tasked with spotting, assessing, targeting, collecting, and handling individuals who have access to classified, open-source, proprietary, or otherwise sensitive data. *Id.* Foreign intelligence entities can also recruit individuals who are positioned for potential future access to high-level information.[5] Generally, the PRCIS or its intermediaries will initially ask potential human sources to produce information on a variety of seemingly innocent topics, such as "China's bilateral relations, the Indo-Pacific

3 *See* U.S. Department of Justice, "Justice Department Charges Two Individuals with Acting as Agents of the PRC Government," July 1, 2025, *available at* https://www.justice.gov/opa/pr/justice-department-charges-two-individuals-acting-agents-prc-government.

4 *See* U.S. Internet Crime Complaint Center, "Safeguarding Our Secrets," June 3, 2026, *available at* https://www.ic3.gov/CSA/2026/260603.pdf.

5 *See* Director of National Intelligence, "Foreign Intelligence Entity Targeting and Recruitment Methodology," *available at* https://www.dni.gov/files/NCSC/documents/SafeguardingScience/foreign-intelligence-entity-targeting-recruitment-methodology.pdf

region, and related defense issues or international trade."[6] Upon receipt of the initial reports, recruited sources are then instructed that "the client requires more privileged information."[7] At this stage, the PRCIS actors have likely compensated their source for an initial report, and may offer additional compensation for "increasingly sensitive information."[8] The PRC's ultimate goal is to obtain information that can be used for economic, political, or military decision-making advantages over other countries, predominantly the United States.

**B. Pauken Moved to the PRC and Met "Cathy"**

Pauken was born and raised in Texas, aside from a five-year period when his family moved to Maryland. PSR ¶¶ 68, 69. He reported a generally stable childhood. *Id.* ¶¶ 69-71. Pauken moved to the PRC in or around 2010 on a Chinese work visa for work related reasons. *Id.* ¶¶ 48, 74. While in the PRC, Pauken worked as a journalist for China Radio International, China Central Television and China Global Television Network. *Id.* ¶ 48. Since March 2024, Pauken worked as an editor for Xinhua News, which is a ministry-level institution of the PRC state council and the official state news agency of the PRC. *Id.*

In or around 2017, Pauken met a Chinese woman whom he knew as "Cathy." *Id.* ¶ 21. Although Cathy originally introduced herself as a consultant for a PRC think tank, Pauken came to understand that Cathy was an agent of the PRCIS, specifically the MSS. *Id*. Later in or around 2025, Pauken would specifically describe Cathy and his other clients as being "state security officers," likely in reference to the MSS. *Id.* ¶ 49.

---

6 *See* U.S. Internet Crime Complaint Center, "Safeguarding Our Secrets," June 3, 2026, *available at* https://www.ic3.gov/CSA/2026/260603.pdf.

7 *Id*.

8 *Id*.

**C. Pauken Knowingly and Willfully Worked for a Foreign Intelligence Service**

Following his introduction to Cathy in 2017, for at least seven years between 2019 and 2026, Pauken completed taskings for Cathy involving recruiting and handling U.S.-based human sources to solicit information that Pauken would include in detailed reports or recorded interviews for Cathy. Over this period, Pauken and Cathy would meet in-person or communicate via encrypted messaging platforms, such as WeChat, Signal, and Telegram. *Id.* ¶ 22. Cathy disclosed to Pauken that she could not visit the U.S. and specifically instructed Pauken to refrain from discussing her identity when he traveled to the U.S. *Id.* Furthermore, in 2022 or 2023, Cathy convinced Pauken to undergo a polygraph examination. *Id.* ¶ 24. Based on the questions asked during the test, Cathy administered the polygraph examination to verify that Pauken was not spying against the PRC or working on behalf of a U.S. intelligence agency. *Id.* By at least 2025, Pauken eventually concluded that Cathy worked as an intelligence officer for the MSS. *Id.* ¶ 21. Pauken understood that the individuals whom he worked for were closely affiliated with the MSS and PRCIS. *Id.* ¶ 40. Despite this understanding, Pauken continued to work as an agent for the PRCIS, carrying out taskings in the U.S. until his arrest on February 27, 2026.

**C. Pauken's Work as an Agent of the PRCIS**

Pauken collected information, interviewed human sources, and compiled reports at the direction of, and for, the PRCIS. During this time, Pauken entered into an agreement with Cathy where he would collect information on specific topics of interest, to include information on U.S. politics, campaigns, candidate policy proposals, and U.S.-PRC relations. *Id.* ¶ 26. Pauken used this information to draft reports for the MSS. During a polygraph examination in or around 2022 or 2023, Pauken developed the understanding that these reports were going to the highest levels of the PRC government, to include the General Secretary of the Chinese Communist Party – Xi

Jinping. *Id.* ¶ 24. Once Pauken confirmed that Cathy had received his written reports, Cathy instructed Pauken to recall or functionally delete their messages for operational security. *Id.* ¶ 25. In return for the information, both Pauken and his sources were paid by the MSS. *Id.* ¶ 42. Pauken ultimately received at least $100,000 for his activities on behalf of the PRC, in addition to other benefits such as repeated travel expenses and a full expense paid family vacation to Shanghai. *Id.* ¶¶ 29, 42.

Early in their relationship, Cathy expressed an interest in obtaining classified materials from Pauken. *Id.* ¶ 29. Although Pauken did not intend to obtain classified information, he nevertheless agreed to act as an intermediary to recruit sources for the MSS at Cathy's request. *Id.* ¶ 40. To facilitate their agreement, Pauken made several trips to the U.S. between 2019 and 2026. Pauken's travel expenses ranged from approximately $7,000 to $8,000 per trip, which were typically paid for by the MSS via Cathy. *Id.* ¶ 29. During these trips, Pauken's ultimate goal was to recruit U.S.-based individuals to provide sensitive or otherwise non-public information to the PRC.

For example, Pauken was introduced to an individual ("Person 1") while attending a political event in the Summer of 2023. *Id.* ¶¶ 26, 52. Approximately six months later, Pauken approached Person 1 about a potential "geopolitical consulting" role and requested a writing sample. *Id.* ¶ 52. Between the end of 2023 and January 2025, Pauken regularly solicited information from Person 1 via written questions or recorded interviews. *Id.* Pauken's role during these interviews was to moderate the conversation based on topics of interest provided by Cathy and the MSS. For example, Cathy tasked Pauken with soliciting information from Person 1 on U.S. political campaigns, policy proposals by U.S. candidates, and insights into the presidential administration. *Id.* ¶ 51. While Pauken originally solicited open-source information from Person

1, Pauken relayed that his "clients" were frequently asking for more sensitive information. *Id.* ¶ 52. At or around the end of 2024 and into 2025, Pauken eventually understood that Cathy's goal was to obtain classified information from Person 1. *Id.* ¶ 28. At one point, Cathy told Pauken that he would "be the one to convince Person 1 to provide classified information." *Id.* ¶ 28. Despite Pauken's reservations regarding Cathy's requests to procure classified information, coupled with his strong suspicion that Person 1 would likely pass classified information if provided the opportunity, Pauken nonetheless continued to develop Person 1 as a human source for the MSS.

In addition to his work with Cathy and the MSS, Pauken also worked with other individuals closely associated with the PRC government. In 2017, Pauken wrote reports for two additional individuals located in the PRC, whom he called Richard and William. *Id.* ¶ 43. These individuals also requested that Pauken undergo a polygraph examination and further suggested that Pauken should apply to work at the U.S. State Department. *Id.* Separately, Pauken also sold reports to a group of Chinese individuals from Wuhan. *Id.* ¶ 44. These clients were mainly focused on obtaining information about technology and the U.S. Department of Justice. *Id.* The Wuhan clients also wanted Pauken to recruit an expert who would help them engage in cyber espionage. *Id.* Pauken understood that his point of contact for the Wuhan clients worked for the PRCIS. *Id.*

**D. Pauken's Interactions with U.S. Law Enforcement**

On or about January 29, 2025, U.S. Customs and Border Patrol ("CBP") agents at Washington Dulles International Airport stopped Pauken during one of his trips to the U.S. from the PRC. *Id.* ¶ 31. During their search, CBP discovered that Pauken had two cellphones, a laptop computer, and $3,000 in cash. *Id.*

A few days later, on January 30, 2025, during a voluntary interview with the FBI, Pauken stated that Cathy tasked him to pass a cellphone and laptop to Person 1. *Id.* ¶ 32. Cathy also

instructed Pauken to provide Person 1 with login credentials to encrypted messaging platforms to facilitate the direct exchange of information between Person 1 and the MSS. *Id.* ¶ 33. After the interview, the FBI instructed Pauken to continue his plan, as the FBI determined that any sudden change could put Pauken at risk from the MSS. *Id.* ¶ 36. However, the FBI admonished Pauken not to obtain, transfer, or to attempt to provide classified material. *Id.* Pauken also signed a non-disclosure agreement, prohibiting him from discussing the contents of the FBI interview with anyone, including Cathy. *Id.*

Nonetheless, upon his return to China, Pauken disregarded the FBI's instructions, telling Cathy that he had met and spoken with U.S. government officials on multiple occasions while he was in the U.S. *Id.* ¶ 41. On February 21, 2026, Pauken returned to the U.S. to once again recruit Person 1 for the MSS. *Id.* On or about February 23, 2026, Pauken offered Person 1 a $10,000 bonus payment if Person 1 resumed working with Cathy and provided Person 1 with a SIM card to communicate with Cathy. *Id.* ¶ 54. During this meeting, Pauken expressed paranoia about people overhearing their conversation in public and requested to meet with Person 1 in a private location. *Id.* ¶ 53. On or about February 25, 2026, Pauken told Person 1 that he was worried about being set up for a "sting operation" after his January 2025 interview with the FBI. *Id.* ¶ 39.

**E. Procedural History**

On the evening of February 27, 2026, the FBI arrested Pauken at the Crowne Plaza Hotel near Dulles Airport prior to his scheduled return to China the following morning. Pauken had his initial appearance on March 2, 2026, before Magistrate Judge Ivan Davis. A detention hearing occurred on March 5, 2026, where Pauken waived his preliminary hearing and the Court ordered continued detention. On June 4, 2026, Pauken waived indictment and pleaded guilty, pursuant to a plea agreement, to a one count criminal information charging him with acting in the United States

as an agent of the PRC without prior notification to the Attorney General in violation of 18 U.S.C. § 951(a). The Court set sentencing for September 1, 2026.

## II. UNITED STATES SENTENCING GUIDELINES CALCULATION

While there is no applicable U.S. Sentencing Guideline ("U.S.S.G.") for a violation of 18 U.S.C. § 951, under U.S.S.G. § 2X5.1, the Court should apply the agreed upon, most analogous guideline for the offense conduct. Here, the parties agree that because Pauken worked at the direction and control of the PRC and acted as an intermediary in a conspiracy to recruit U.S. nationals to provide sensitive government information, the most analogous guideline is U.S.S.G. § 2M3.3, with a base offense level of 24. *See* Plea Agreement ¶ 4; PSR ¶ 4.

The court should also apply a three-level reduction under U.S.S.G. § 3E1.1, because Pauken has demonstrated acceptance of responsibility for his offense. Pauken made a timely notification of his intention to enter a guilty plea and therefore permitted the government to avoid preparing for trial and permitted the government and the Court to allocate their resources efficiently. *See* U.S.S.G. § 3E1.1(b).

The presentence report found that Pauken is a zero-point offender (PSR ¶ 63), and the government is not currently aware of any information that would prohibit the application of a two-level reduction under U.S.S.G. § 4C1.1. Therefore, the government calculates the adjusted offense level at 19, with an associated confinement range of 30-37 months.

The government submits that a 33-month term of imprisonment appropriately reflects this guidelines calculation, while considering the statutory factors set forth in 18 U.S.C. § 3553(a), discussed in detail below.

## III. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### 1. Nature and Circumstances of the Offense

Pauken's work as an agent for the PRC government and intelligence services follows a long-running effort by the PRC to undermine U.S. national security. The PRC regularly seeks to obtain sensitive U.S. information to give the PRC a decisive geo-strategic decision-making advantage over the U.S. As such, PRC efforts to gather this information can jeopardize the lives of U.S. personnel abroad, destabilize U.S. economic prosperity, and invite interference into U.S. democratic institutions.[9] Even though he understood the malign motives of PRC operatives, Pauken actively worked for PRC intelligence officers for over seven years, providing information to the PRCIS to the detriment of U.S. national security interests. While the government acknowledges that Pauken did not pass classified information, even unclassified information can provide a foreign adversary with valuable insight into U.S. foreign and domestic policy. In particular, "unclassified information on government policy . . . can be collected and combined with more sensitive reporting to form a comprehensive operational picture" for the PRC government.[10]

More specifically, some of the information Pauken delivered to the MSS regarding U.S. politics, campaigns, candidate policy proposals, and insight into a U.S. presidential administration could enable Chinese foreign malign influence efforts to undermine U.S. institutions and democratic processes.[11] The unpredictability of the information's utility to the PRC is precisely what makes Pauken's actions, and those engaging in similar conduct, so concerning. And it is why

---

9 *See* U.S. Internet Crime Complaint Center, "Safeguarding Our Secrets," June 3, 2026, available at https://www.ic3.gov/CSA/2026/260603.pdf.

10 *Id.*

11 *See* Office of National Intelligence – National Counterintelligence and Security Center, "Counterintelligence Strategy," July 30, 2024, *available at* https://www.dni.gov/files/NCSC/documents/features/NCSC_CI_Strategy-pages-20240730.pdf**.**

the U.S. goes to great lengths to protect the types of information Pauken sought to exploit.

Pauken went to considerable lengths to collect information for the PRC. He traveled repeatedly to the U.S. with the specific purpose of recruiting individuals for, and providing information to, the PRCIS. Though he claims to have had reservations or objections to the underlying goals of the scheme, Pauken agreed with his MSS handler Cathy, and others, to cultivate relationships with U.S. nationals who he believed were in positions to provide sensitive, non-public or classified information to the PRCIS.

Once identified, Pauken's approach to cultivating U.S. sources mirrored common foreign intelligence recruitment practices – first soliciting open-source or publicly available information from his sources.[12] In exchange for their cooperation, Pauken paid sources on behalf of the MSS. As Pauken fostered trust with his sources, he would eventually mention that his "clients" were frequently seeking access to more sensitive information. PSR ¶ 52. Over time, then, seemingly anodyne requests for information ripened into opportunities for the PRC access to more sensitive information that could directly undermine U.S. interests.[13]

Acknowledging that Pauken accepted responsibility for his crime and has displayed remorse since pleading guilty – warranting the application of U.S.S.G. § 3E1.1 and a recommendation within the agreed upon guidelines – this contrition or acceptance does not diminish the seriousness of Pauken's actions and culpability in a years-long scheme to act as an unregistered agent of the PRC. Pauken's efforts to recruit U.S. nationals and solicit information on behalf of the PRCIS continued for at least seven years. During this time, Pauken made a

---

12 *See* U.S. Internet Crime Complaint Center, "Safeguarding Our Secrets," June 3, 2026, *available* https://www.ic3.gov/CSA/2026/260603.pdf.

13 *See* United States Air Force Nuclear Weapons Center, "Foreign Intel Job Scams Target Current, Former DoD Employees," April 21, 2025, https://www.afnwc.af.mil/News/Article-Display/Article/4161724/foreign-intel-job-scams-target-current-former-dod-employees/

concerted effort to use a variety of MSS operational security measures to mitigate detection. It should have been readily apparent to Pauken that these security measures were implemented because he was engaged in illicit and clandestine conduct on behalf of the PRCIS. Pauken primarily used encrypted messaging platforms (*i.e.*, WeChat, Signal and Telegram) to communicate with his MSS handlers, designed to ensure third parties could not access their exchanged messages, files, and other data. Additionally, Pauken functionally deleted messages containing any trace that he was sending information to his MSS handler. *Id.* ¶ 25. As an extra security measure, Pauken personally delivered a Samsung cellphone to his U.S. source – with two pre-installed encrypted messaging applications to facilitate secure communication with the MSS – from the PRC to the U.S. *Id.* ¶ 52. Pauken further provided this source with a newly purchased $3,000 laptop and login credentials to the same encrypted messaging platforms used by Pauken and his handler. Separately, the MSS went so far as to polygraph Pauken to verify his identify and ensure he was not "spying against the PRC." *Id.* ¶ 24. If it was not completely clear from the nature of the MSS taskings and his agreement with Cathy, these operational security measures should have left Pauken with little doubt that he was surreptitiously involved in an illegal scheme to serve a foreign power. These extraordinary security measures were ostensibly being used to obfuscate this illegal activity and complicate detection efforts by U.S. law enforcement.

As evidence of Pauken's grasp of this scheme and the associated risks, he personally assessed that one of his sources would likely give classified information to the MSS if given the opportunity. *Id.* ¶ 28. Yet, despite Pauken's self-proclaimed hesitation to personally handle classified material, he nonetheless continued to develop a relationship with Person 1 for the MSS – including providing Person 1 with secure modes of communication – with, apparently, an astute understanding of the motivations of Person 1 and the MSS. Knowing this, even with his

reservations, Pauken continued to facilitate the MSS with unfettered access to an individual who he believed had the capacity to provide classified information to the PRC. When this individual stopped providing information, the MSS directed Pauken to travel to the U.S. to convince Person 1 to resume working for the MSS. *Id.* ¶ 37. In February 2026, Pauken went so far as to offer Person 1 a $10,000 bonus payment – to be paid via covert means – if Person 1 continued to supply the PRC with information. *Id.* ¶ 54. This request came just days before the FBI arrested Pauken, indicating that Pauken would have continued his work for the PRCIS in the U.S. if the FBI had not intervened. And despite Pauken's representations that he had no intent to gather or pass classified information, his MSS handlers clearly desired him to do so, and it is entirely possible that Pauken's continued involvement could have evolved to include classified information. Therefore, Pauken's deliberate effort to operate within the U.S. to recruit human assets, solicit information, and disseminate reports for the PRCIS jeopardized U.S. national security interests. If the FBI had not disrupted it, this activity had the potential to ripen into even more serious conduct involving even more sensitive information and might have inflicted even more substantial harm to U.S. national security. As such, Pauken's sentence should reflect the seriousness of his offense and deter others from engaging in similar conduct.

**2. History and Characteristics of the Offender**

Pauken's history and characteristics do not warrant a sentence outside the agreed upon guidelines range. Pauken is an educated individual with a bachelor's degree in political science and previously completed graduate-level writing courses while working towards a master's degree. PSR ¶¶ 87, 88. When Pauken initially moved abroad in 2010, he held multiple jobs as a writer, videographer, and copy editor for PRC news agencies. He also taught English as a second language for six years while living in South Korea from 2001 to 2007. *Id.* ¶ 94. Clearly, Pauken had the

capacity to earn a lawful salary. Instead, Pauken elected to work as an illegal agent of the PRC, receiving at least $100,000 via wire payments to his wife's bank account. *Id.* ¶ 50. These payments were in addition to other forms of financial compensation, such as an all-expense family vacation and additional travel expenses paid by the PRC. *Id.* ¶ 42. In 2023, Pauken worked with his MSS handler to secure payments for both him and his sources. *Id.* ¶ 26. Subsequently, in the same year, Pauken and his wife were able to purchase two apartments in China for a combined total of $400,000. *Id.* ¶ 98.

Pauken's background shows he had the requisite sophistication to participate in this scheme. He fully understood that he was working at the behest of the MSS and the PRCIS. Early in the relationship with Cathy, Pauken recognized the MSS's ultimate goal: obtaining classified material. While Pauken may have had reservations about obtaining classified information himself, those reservations did not prevent him from colluding with a PRC intelligence officer for years; regularly draft reports for the PRCIS on sensitive U.S. government topics; providing potential U.S. sources with the technological means to communicate with the MSS; accept at least $100,000 in financial compensation for his work; or, more generally, extend to any other facet of Pauken's voluntary participation as an agent of the PRC between at least 2019 and 2026.

Indeed, the information solicited by a foreign intelligence service does not necessarily need to be classified to have a deleterious effect on U.S. national security. Information pertaining to U.S. policy, politics, elections, or other strategic objectives can allow foreign intelligence entities to manipulate public opinion and "conduct[ ] influence operations aimed at U.S. decision-makers," in order to advance their own foreign interests.[14] More specifically, the PRC uses information to directly undermine U.S. policies which "threaten Beijing's interest, including China's

14 *Id.*

international image, access to markets, and technological expertise."[15] While Pauken did not personally procure classified information, he was not a passive bystander. He knew better. The information Pauken provided to the MSS regarding U.S. campaigns, candidates' policy proposals, and general U.S.-PRC relations, can directly enable malign influence efforts by the PRC. Furthermore, he actively worked to recruit individuals who could eventually provide classified, sensitive, or otherwise non-public information directly to the MSS. Accordingly, Pauken's history and characteristics do not warrant a lenient sentence.

**3. The Need to Afford Adequate Deterrence**

The government seeks a sentence of 33 months in this case in part because it has the potential to deter other actors involved in ongoing sophisticated quasi-espionage schemes such as this. It is no secret that malign PRC activities against the U.S. are pervasive and often challenging to disrupt. The PRCIS and its sub-affiliated entities are historically ranked high on the list of foreign intelligence threats to U.S. national security.[16] As the United States continues to outpace its foreign adversaries in military capabilities and other technological developments, foreign intelligence entities, predominantly the PRC, have increased their persistent and aggressive attempts to collect information from U.S.-based individuals.

However, foreign intelligence entities are not working alone. Often, and as exemplified in this case, foreign intelligence officers generally work in tandem with an intermediary to help broker relationships, recruit sources, and disseminate information back to the host government. While the U.S. national security apparatus works to deter foreign intelligence personnel from

15 *See* Office of National Intelligence, "2024: Annual Threat Assessment of the U.S. Intelligence Community", February 5, 2024, *available at* https://archive.dni.gov/files/ODNI/documents/assessments/ATA-2024-Unclassified-Report.pdf

16 *See* United States-China Economic and Security Review Commission, "Michelle Van Cleave, Statement for the Record," June 9, 2016, *available at https*://www.uscc.gov/sites/default/files/Michelle%20Van%20Cleave_Written%20Testimony060916.pdf.

operating directly on U.S. soil, as demonstrated here by Cathy's unwillingness to travel to the U.S., imposing a meaningful term of imprisonment on a cut-out such as Pauken will deter other individuals from becoming similarly well-compensated conduits of information and recruitment for foreign intelligence services.

While the specifics of each scheme are different, the ultimate goals are the same: to undermine U.S. interests. Those cases, such as Pauken's, that are disrupted and prosecuted must send a strong message that acting on behalf of a foreign intelligence entity in the U.S. has serious consequences. These are cases where savvy operatives engage in complex planning, concealment and execution. These schemes, in and of themselves, are sophisticated and difficult to detect. A significant sentence will send a message that when these schemes are disrupted, they will be met with harsh consequences.

**4. The Need to Avoid Unwarranted Sentencing Disparities**

The proposed 33-month sentence aligns with the punishment imposed by courts in numerous analogous cases, particularly when considering the specifics of Pauken's conduct. The Government acknowledges that sentences for violations of 18 U.S.C. § 951 vary given the lack of an applicable sentencing guideline and the breadth of activity falling within the statute's purview. However, a sentence of 33 months imprisonment is comparable to the sentences imposed on other similarly situated defendants charged under 18 U.S.C. § 951 following schemes to feed information to foreign adversaries. In *United States v. Buryakov*, the defendant pled guilty to conspiring to act as an unregistered agent in the U.S. based on his agreement to operate in the U.S. and gather information at the direction of the Russian government. *See United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.) (*Minute Order*, March 11, 2016). Over three years, Buryakov responded to intelligence taskings from his handler, identified potential U.S.-based sources, solicited

information, and obtained documents on behalf of the Russian intelligence service. *See* Superseding Indictment, *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y. Feb. 17, 2016) (ECF No. 118). In *Buryakov*, Judge Richard Berman agreed with both the government and the defense and held that 30 months' imprisonment was adequate to "reflect the seriousness of the offense." *See United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y. May 25, 2015), Sent. Tr. 20:5 (ECF No. 160).

Similarly, in *United States v. Doostdar*, the defendant Ahmadreza Doostdar pled guilty to one count of violating 18 U.S.C. § 951, and one count of conspiracy to do the same. *See United States v. Doostdar*, No. 18-CR-255 (D.D.C.) (ECF No. 75, *Minute Order,* October 8, 2019). The Government of Iran used Doostdar as an intermediary to recruit U.S. individuals who could provide information on members of an Iranian opposition group located in the U.S. *See generally United States v. Doostdar*, No. 18-255 (PLF), 2020 WL 345796 (D.D.C., Jan. 10, 2020). Over the span of one year, Doostdar worked with a handler and solicited information from his sources based on Iranian taskings. *See id.* Additionally, the defendant directly facilitated the transfer of information back to the Iranian government. In one instance, Doostdar traveled to the United States with a concealed flash drive hidden in a toy keychain. Doostdar further provided this flash drive to his source and instructed him to upload surveillance photos and other personally identifiable information on Iranian dissidents located within the United States. Doostdar then retrieved the flash drive from his source prior to boarding a flight back to Iran. *Id.* Due to several aggravating factors, including Doostdar's physical surveillance of U.S. persons, the government requested a sentence at or near the high end of the 51 to 71 month range. *Id.* However, the court acknowledged that Doostdar's guilty plea permitted the government and the court to allocate their resources more efficiently, and sentenced Doostdar to 38 months' imprisonment after considering, *inter alia*, its

likelihood of "deter[ring] individuals who are on the edge about whether to provide assistance or not." *See United States v. Doostdar*, No. 18-CR-255 (D.D.C. Jan. 15, 2020) Sent. Tr. 56:25.

In *United States v. Yeo*, the defendant, Jun Wei Yeo, pled guilty to a one count Information for violating 18 U.S.C. § 951. *See United States v. Yeo*, No. 20-cr-87 (D.D.C.) (ECF No. 21). Yeo, a Singaporean national, worked as an intermediary for the PRCIS for approximately four years. During this scheme, Yeo identified potential U.S. military and government employees who had access to non-public, sensitive, and classified information that could be of value to the PRC government. *See United States v. Yeo*, No. 20-cr-87 (D.D.C. Oct. 1, 2020), Gov't Memorandum in Aid of Sentencing, at 1-2 (ECF No. 14). Yeo subsequently asked his U.S.-based sources to write reports on a variety of U.S. economic, military, and political topics to satisfy taskings provided by his PRCIS handlers. Some of these reports included information on the withdrawal of U.S. troops from Afghanistan, and the religious affiliation of a specific U.S. cabinet member. *Id*. at 2. Although Yeo was arrested prior to obtaining any classified information, Judge Tanya Chutkan acknowledged that the seriousness of an 18 U.S.C. § 951 violation could not be ignored "just because Mr. Yeo wasn't charged under the Espionage Act." *See United States v. Yeo*, No. 20-cr-87 (D.D.C. Oct. 9, 2020), Sent. Tr. 27:8 (ECF No. 28). Judge Chutkan remarked that, "I don't want to diminish the fact that Mr. Yeo worked under the direction and control of the intelligence service operations from the People's Republic of China, trying to obtain valuable nonpublic information from the United States []." *See id.* at 13:16. Given that Yeo was a highly educated individual who used sophisticated tradecraft, the court "ha[d] no doubt" Yeo understood that his operation was "designed to weaken the United States to the benefit of China." *See id.* at 28:12. Similarly, here, Pauken is also an educated individual who understood the culpability of his actions while working as an agent of the PRCIS.

The Court in *Yeo* ultimately imposed a 14-month sentence. However, this was after factoring in a significant downward departure based on the government's recommendation of 16-months since Yeo provided "credible information to both law enforcement and intelligence value." *United States v. Yeo*, No. 20-cr-87 (D.D.C. Oct. 9, 2020), Sent. Tr. 14:16 (ECF No. 28). Had Yeo not provided this information, the government indicated that a 30-month sentence was warranted due to the seriousness of the offense. *See United States v. Yeo*, No. 20-cr-87 (D.D.C. Oct. 1, 2020), Gov't Memorandum in Aid of Sentencing, at 1-2 (ECF No. 14). In contrast to *Yeo*, here, the government is not recommending a sentence below the agreed upon guideline range in the plea agreement.[17]

Given these factors, a sentence of 33 months' imprisonment is not only appropriate, but necessary to reflect similarly situated 18 U.S.C. § 951 offenses. This sentence considers the gravity of the offense, the harm to U.S. national security, and reflects similar sentences imposed on other similarly situated defendants.

**IV. CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 33 months' imprisonment, 36 months supervised release, and a $100 special assessment.

---

[redacted]

Date: August 25, 2026

Todd W. Blanche
Attorney General

John A. Eisenberg
Assistant Attorney General for National Security

Gordon Kromberg
Assistant United States Attorney

By: */s/ Eli Ross*
Eli Ross
Trial Attorney, Counterintelligence & Export Control Section
National Security Division